IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN L. MILLER, III, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 20-_____ |
| | : | |
| CITY OF PHILADELPHIA; JEFFREY | : | JURY TRIAL DEMANDED |
| PIREE; WILLIAM COOGAN; | : | |
| RICHARD BOVA; JOHN BELL; and | : | |
| MICHAEL SHARKEY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

## I.   PRELIMINARY STATEMENT

1.     This matter concerns the extraordinary misconduct of Philadelphia Police

Department detectives who caused the wrongful prosecution, conviction, and 22-year

imprisonment of plaintiff John L. Miller, III, for a murder he did not commit.  Mr. Miller's claim

of innocence is not a bare assertion.  His innocence is undeniable because the real perpetrator of

the murder confessed to the crime only four years after Mr. Miller's conviction.  The real

perpetrator *had* told police that it was Mr. Miller who committed the crime, and it was this

statement that police used to convict Mr. Miller.  But, as Mr. Miller learned years later, the

defendant detectives had every reason to know that the statement was false from the beginning,

and they hid critical information that would have proven the statement's falsity.  Only after this

hidden information came to light was Mr. Miller able to prevail in his two-decade-long fight for

exoneration.

2.      The crime that resulted in Mr. Miller's wrongful conviction occurred in the late evening hours of October 8, 1996.  A man named Anthony Mullen was found dead in a parking lot adjacent to 30th Street Station in Philadelphia.  Mullen, who worked as an attendant in the parking lot, had been shot once through the chest.

3.      After months without any concrete leads, in late February 1997, Philadelphia Police Department ("PPD") detectives arrested David Williams for a string of violent gunpoint robberies throughout the City.  Williams, trying to help himself and limit his own criminal exposure, told police that Mr. Miller had admitted to killing Mullen during an attempted robbery.

4.      Williams' statement to police was false, and the defendant detectives had two important reasons to know it.  First, Williams told detectives that another man, Mark Manigault, was a witness to the Mullen murder and could provide first-hand information confirming that Mr. Miller killed Mullen, but when police went to speak to Manigault, he told them he knew nothing about the murder because he was incarcerated when it occurred.  And, second, Williams gave police information on an unrelated homicide, claiming that a man named Jack Williams had admitted to the killing, but that information was demonstrably false such that prosecutors declined to even use his testimony at Jack Williams' trial.

5.      Despite their knowledge that David Williams had made material false statements regarding two different murder investigations and that these false statements directly undermined David Williams' claim that Mr. Miller had confessed to the crime, and notwithstanding the absence of any physical or forensic evidence connecting Mr. Miller to the offense, the detectives decided to initiate a prosecution of Mr. Miller for the Mullen murder.  They did so while never

telling prosecutors in Mr. Miller's case, or, for that matter, Mr. Miller and his counsel, anything about either Mark Manigault or Jack Williams.

6.      During both Mr. Miller's preliminary hearing and trial, David Williams admitted he had given a false statement to police and that Mr. Miller never confessed to the crime.  Still, the detectives did not disclose the exculpatory information proving the falsity of Williams' initial statement.  Instead, they insisted that the statement was true and proceeded with the prosecution.  On September 29, 1998, a jury, relying principally on police testimony concerning David Williams' original statement, convicted Mr. Miller of second-degree murder and related offenses.  He was sentenced to life in prison without possibility of parole.

7.      After Mr. Miller's conviction, David Williams wrote to Mr. Miller's mother with a stunning admission.  He not only repeated what he said in his in-court testimony, that he had given a false statement implicating Mr. Miller, but also said that *he* was the person who murdered Anthony Mullen.  Still, despite the remarkable fact that the person whose statement had led to Mr. Miller's conviction admitted to committing the crime himself, the defendant detectives failed to disclose to either prosecutors or Mr. Miller that they had information showing the falsity of Williams' original statement.

8.      For more than twenty years, Mr. Miller fought his conviction with appeals and post-conviction challenges.  Finally, after a wide-ranging investigation led by the Pennsylvania Innocence Project, Mr. Miller's post-conviction counsel learned that Mark Manigault and Jack Williams might have important information about the case, and they conducted interviews with them.  Given what they learned from these interviews, Mr. Miller's counsel were able to draw the conclusion that police had known from the beginning that David Williams' statement was

unworthy of belief.  Based on this new information, in July 2019, Mr. Miller obtained habeas relief in this Court with an Order vacating his conviction.

9.      Once Mr. Miller's conviction was vacated, lawyers in the Conviction Integrity Unit of the Philadelphia District Attorney's Office reviewed the defendant detectives' investigation file.  There, they found documents confirming that detectives had in fact interviewed Mark Manigault and that the detectives knew with certainty that Williams' statements about Manigault were false.  Those documents and the information contained in them had never been disclosed to anyone outside the Philadelphia Police Department.

10.     In light of these findings, prosecutors moved to dismiss the charges against Mr. Miller.  On July 31, 2019, the Philadelphia Court of Common Pleas granted that motion.  Mr. Miller, who was 21 years old at the time of his arrest, was released from prison at the age of 44.

11.     Mr. Miller's conviction for a crime he did not commit was the direct result of the defendant detectives' withholding of critical exculpatory information, introduction of fabricated evidence, initiation of a malicious prosecution, and discrimination against Mr. Miller, a Black man, on the basis of his race.  These actions were the natural product of the City of Philadelphia's long historic practice of failing to train, supervise, and discipline detectives in the Philadelphia Police Department Homicide Division to comply with clearly established constitutional obligations and the City's acquiescence to established customs of improper police practices.  In particular, the defendants were permitted to act as they did under the City's tolerance of detectives' established practice of bringing false charges against young Black men in an intentionally discriminatory fashion.

12.     The defendants' collective actions and inactions caused Mr. Miller substantial and significant damages.  Through his two-plus decade imprisonment, he experienced physical pain and suffering, emotional trauma, and the deprivation of his liberty and enjoyment of life.  Mr. Miller brings this action asserting civil rights claims under 42 U.S.C. § 1983 and supplemental state law claims under Pennsylvania law seeking compensation for these harms and losses.

## II.    JURISDICTION

13.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III.    PARTIES

14.     Plaintiff John L. Miller, III, aged 45, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania.

15.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants.

16.     Defendant Jeffrey Piree was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

17.     Defendant William Coogan was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

18.     Defendant Richard Bova was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

19.     Defendant John Bell was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division.  He is sued in his individual capacity.

20.     Defendant Michael Sharkey was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Southwest Detective Division.  He is sued in his individual capacity.

21.     At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

22.     At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.    FACTS

### A.    The Murder of Anthony Mullen and David Williams' False Statement Implicating John Miller

23.     On October 8, 1996, a few minutes after 11:30 p.m., Philadelphia police received a call that a man had been shot at 3051 JFK Boulevard, the location of a parking lot adjacent to 30th Street Station.

24.     On arrival at that location, police found a man on the ground with a gunshot wound to the chest.  The man was identified as 49-year-old Anthony Mullen.  He was pronounced dead at the scene.

25.     Defendant Detective William Coogan was assigned by the PPD Homicide Division to lead the investigation into the Mullen murder.  His partner, defendant Detective Richard Bova, assisted in leading the investigation as did defendant Detective John Bell.

26.     The investigating detectives had trouble developing leads.  They were unable to locate any eyewitnesses, and they had no forensic evidence pointing to any suspects.

6

27.     For months, there was no progress in the investigation.

28.     Nearly five months after the murder, on February 27, 1997, Philadelphia police arrested David Williams and Mark Manigault for a string of violent robberies.

29.     Williams and Manigault were detained together in a PPD holding cell.

30.     While in the holding cell, Williams told Manigault that he was going to try to minimize the consequences for the multiple robberies they committed by giving information to detectives about a number of murder cases.

31.     On February 28, 1997, Williams had an interview with defendant Detective Michael Sharkey of the PPD's Southwest Detective Division.

32.     In that interview, Williams admitted to committing all of the robberies for which he had been arrested and even admitted committing other robberies that were not the subject of any pending charges.

33.     As Williams told Manigault he would do, he informed Sharkey that he had information about multiple murders.

34.     Williams first mentioned the murder of Anthony Mullen.  He told Sharkey that Mr. Miller had confessed to that murder and that Mr. Miller gave him a detailed account of how it occurred.

35.     In an effort to help Manigault minimize the consequences of the robberies they committed together, Williams told Sharkey that Manigault was present at the scene of the Mullen murder and could confirm that Mr. Miller was the person who killed Mullen.

36.     Williams also told Sharkey that he had information about a second murder, this one involving an acquaintance of his, Jack Williams.  According to David Williams, Jack

Williams had admitted to him that he killed a man named Paul Jones at 56th and Beaumont Streets in Southwest Philadelphia in July 1996.

37.     Sharkey did not record information about Williams' statements concerning the murders in any notes or reports.

38.     Instead, he called defendant Detective Jeffrey Piree, who was assigned to the PPD Homicide Division Special Investigations Unit where he was responsible for investigating leads in cold homicide cases.

39.     Sharkey told Piree that Williams and Manigault had information about open homicide investigations, including the Anthony Mullen and Paul Jones murders.

40.     Piree told Sharkey that he would interview Williams and Manigault in the coming days.

> **B.     Homicide Detectives' Interviews of David Williams and the Burying of Information Proving his Lies**

41.     On March 4, 1997, Piree transported David Williams from the Philadelphia Prison System, where he was held while awaiting trial on his robbery charges, to Homicide Division headquarters.

42.     Piree first brought Williams to an interview room to meet with a Detective McDermott concerning the July 1996 shooting of Paul Jones.

43.     During that interview, as reported in a signed statement, David Williams told McDermott that he had spoken by telephone with Jack Williams while Jack Williams was incarcerated in the Philadelphia Prison System and that Jack Williams had admitted in that phone call to shooting Jones.

44.     David Williams' statement was false.  He never spoke to Jack Williams over the telephone, and he never heard Jack Williams admit to shooting Jones.

45.     It was obvious to police that David Williams' statement was false.  Had the telephone call taken place, the Philadelphia Prison System would have had a record of that call, and there was no such record.

46.     Piree learned of the content of David Williams' statement about Jack Williams and was aware of the obvious falsehood in David Williams' account.

47.     After David Williams finished his interview with McDermott, Piree took him to a different interview room to begin asking him questions about the Anthony Mullen murder.

48.     During the interview, Piree prepared a handwritten statement that Williams signed at the conclusion of the interview.  The statement purported to provide a verbatim recording of Piree's questions to Williams and Williams' answers to those questions.

49.     According to the statement, Williams reported that Mr. Miller, who lived in the same neighborhood as him, gave him a full confession to murdering Mullen during a robbery. Williams' account of the confession was detailed, including allegations that Mr. Miller admitted the following:

> a.   He attempted to rob Mullen, but Mullen would not give him any money, leading to Mr. Miller shooting Mullen;
>
> b.   His finger was injured when Mullen slammed a door shut on it during the attempted robbery;
>
> c.   He got the gun that he used in the murder from a neighborhood teenager named Michael Arnold; and

    d.   He told Arnold that he shot Mullen during the robbery and then got rid of the gun.

50.    Williams also told Piree that he spoke to Arnold and that Arnold admitted to loaning a gun to Mr. Miller so he could use it for a robbery.  Arnold told Williams, according to Williams' statement, that Mr. Miller had acknowledged using the gun to shoot somebody during a robbery.

51.    During the interview, Williams told Piree that Mark Manigault was present at the scene of the murder and that Manigault could confirm that Mr. Miller was the person who committed the murder.

52.    Piree did not include any information about Manigault in the handwritten statement.

53.    Because Williams had told both Sharkey and Piree that Manigault had critical eyewitness information concerning the Mullen murder, Piree arranged to bring Manigault to the Homicide Division for an interview.

54.    Piree conducted an interview with Manigault on or around May 14, 1997.

55.    During that interview, Piree told Manigault that David Williams had said he was present at the scene of the Anthony Mullen murder and could provide information about the person who committed the murder.

56.    Manigault told Piree that he had no information about the Mullen murder.

57.    Nor, Manigault told Piree, could he have had information about the Mullen murder because he was incarcerated in the Philadelphia Prison System when the murder happened.

58.     Piree and the other defendant detectives confirmed from police records that Manigault had been arrested on October 7, 1996—the day before the Mullen murder—and had been in custody when the murder occurred.

59.     Based on Manigault's statement and the corroboration of that statement found in police records, Piree knew that Williams had provided false information to him in his March 4, 1997, interview, and also in his February 28, 1997, interview with Sharkey.

60.     The fact that Williams had given provably false information to Sharkey and Piree undermined the credibility of everything Williams told Sharkey and Piree about Mr. Miller's alleged confession.

61.     Piree also knew that David Williams' provision of false information in yet another case—his statement about Jack Williams' alleged involvement in the Paul Jones murder—further undermined the credibility of his statement concerning Mr. Miller's alleged confession.

62.     Piree and the other defendant detectives knew based on clearly established law in 1997 that any information tending to undermine a witness's credibility was exculpatory and that they had a constitutional obligation to ensure the provision of such information to the charged criminal suspect by turning it over to prosecutors.

63.     Piree was thus knowingly in possession of several highly exculpatory facts with respect to Mr. Miller's alleged involvement in the crime, including: that David Williams claimed Manigault had eyewitness information about the Mullen murder when Manigault definitively had no such information and that David Williams provided false information implicating Jack Williams.

11

64.     In short, Piree knew that the only evidence pointing to Mr. Miller as a suspect in the Mullen murder had been given to him by a known liar.

65.     Following his interviews with Williams and Manigault, Piree shared all of the exculpatory information he gathered with defendant Detectives Coogan, Bova, Bell, and Sharkey.

66.     Despite his knowledge of the exculpatory nature of this information, Piree prepared no formal report for the Mullen murder investigation file that mentioned Williams' statement about Manigault, Piree's interview with Manigault, or Williams' statement about Jack Williams.  Nor did any of the other defendant detectives prepare such a report.

67.     Instead, the defendant detectives recorded this information in handwritten notes and typed "activity sheets," which provided a running record of detectives' findings during the investigation.

68.     The defendant detectives placed the notes and activity sheets in the PPD Homicide File, known as an "H-file," for the Mullen murder.  None of the defendant detectives shared the contents of the H-file with anyone outside the PPD.

69.     Nor did any of the defendant detectives tell anyone outside the PPD, including prosecutors or Mr. Miller and his counsel, about the exculpatory information they obtained concerning Manigault and Jack Williams.

**C.      The Defendant Detectives' Threatening Encounter with Sixteen-Year-Old Michael Arnold**

70.     Based on Williams' statements, the defendant detectives began to search for Michael Arnold.  They located him at a private boarding school in Montgomery County, where

12

he had been sent by the Philadelphia Department of Human Services due to apparent parental neglect.

71.     Defendant Detectives Bova and Coogan went to the school to interview Arnold on June 23, 1997.

72.     At the beginning of the interview, Bova and Coogan told Arnold what Williams had said about him providing a gun to Mr. Miller.

73.     Bova and Coogan made clear to Arnold that based on Williams' account they believed he was an accomplice to Mr. Miller in the Mullen murder.

74.     Arnold, fearing that he could be prosecuted for murder, tried to give Bova and Coogan information he believed they wanted to hear.

75.     According to a signed written statement, Arnold told police that Mr. Miller had, in fact, taken a gun that previously belonged to Arnold.

76.     Arnold told Bova and Coogan, according to the statement, that, in the midst of a fight between teenagers taking place on his street, he got a gun from his house, brought it outside, and, when police arrived on the scene, placed it on the ground.  It was at that point, the statement said, that Mr. Miller picked up the gun and told Arnold he would hold onto it.

77.     Arnold's statement was false.  There never was such a fight on his street, and he never observed Mr. Miller pick up a gun off the street.  Nor did Mr. Miller ever have a gun.

78.     Arnold only signed the statement as a result of Bova's and Coogan's threats that he could be charged for involvement in the Mullen murder.

**D.      The Defendant Detectives Secure Mr. Miller's Arrest by Hiding Exculpatory Information**

79.      Immediately after Bova and Coogan completed their interview with Arnold, the defendant detectives prepared a warrant for the arrest of Mr. Miller on murder and related charges.

80.      In the affidavit of probable cause supporting the arrest, the defendant detectives recounted the information provided in Williams' and Arnold's signed statements.

81.      Nowhere in the affidavit did the defendant detectives include any of the exculpatory information which they were aware of, including:

a.   That Williams had reported that Manigault was an eyewitness to the Mullen murder;

b.   That Manigault had been interviewed and denied any knowledge of the murder;

c.   That Manigault's denial of knowledge was fully corroborated by police records;

d.   That David Williams claimed Jack Williams confessed to the Paul Jones murder;

e.   That David Williams' claims regarding Jack Williams were provably false on review of Philadelphia Prison System records; and

f.   That Arnold gave a statement regarding Mr. Miller's possession of a gun only after police threatened him with charges for the Mullen murder.

82.      The defendant detectives, therefore, omitted all information showing that the accounts provided by Williams and Arnold were false.

14

83.     Defendant Detective Bell signed the affidavit of probable cause and submitted it to an Assistant District Attorney.

84.     When submitting the affidavit of probable cause to the Assistant District Attorney, neither defendant Bell nor any other of the defendant detectives informed the Assistant District Attorney about the exculpatory information outlined above.

85.     The Assistant District Attorney who reviewed the Affidavit of Probable Cause approved the warrant.

86.     Had the defendant detectives included the exculpatory information in the affidavit, there would have been no probable cause to support the arrest of Mr. Miller, and the District Attorney's Office would not have approved the warrant.

87.     The next day, June 24, 1997, the defendant detectives arrested Mr. Miller at his home.  He was held without bail while awaiting a hearing on his charges.

**E.     David Williams' Truthful Recantation at Mr. Miller's Preliminary Hearing and Trial, and Detective Piree's Introduction of the Fabricated Confession**

88.     On October 30, 1997, Mr. Miller had a preliminary hearing in Philadelphia Municipal Court.

89.     At no time before the hearing did the defendant detectives disclose to prosecutors involved in Mr. Miller's case or Mr. Miller and his counsel the exculpatory information outlined above.

90.     At the hearing, David Williams testified that his statement to Piree was false.  Mr. Miller, Williams testified, had never confessed to shooting Anthony Mullen.

15

91.     Williams testified that he made up facts about Mr. Miller because he was angry with him in relation to a long-running dispute and because he wanted to help himself with his own criminal cases, which were likely to result in severe punishment.

92.     Following Williams' testimony, the prosecution called Piree to the witness stand. Piree described the process of taking the written statement from Williams and read into the record the key components of that written statement.

93.     Based on the admission of Piree's testimony concerning the statement, the Municipal Court Judge conducting the hearing held Mr. Miller for trial on all charges.

94.     At no time during the hearing did Piree inform prosecutors or Mr. Miller and his counsel about the exculpatory information outlined above which would have undermined Williams' written statement and corroborated Williams' in-court testimony that the statement was false.

95.     The prosecution brought Mr. Miller to trial in front of a jury in the Philadelphia Court of Common Pleas starting on September 24, 1998.

96.     At no time between the preliminary hearing and trial did the defendant detectives disclose to prosecutors involved in Mr. Miller's case or Mr. Miller and his counsel the exculpatory information outlined above.

97.     At trial, the prosecution presented the testimony of David Williams.  As he did at the preliminary hearing, Williams testified that his statement to Piree was false and that Mr. Miller had never confessed to shooting Anthony Mullen.

98.     Once again, the prosecution called Piree to the witness stand.  Piree read into the record the key components of David Williams' written statement and presented the statement as if it was truthful.

99.     At no time during his testimony did Piree reference the exculpatory information outlined above which would have undermined the credibility of Williams' statement regarding Mr. Miller's involvement in the Mullen murder and corroborated Williams' trial testimony that the statement was false.

100.    The prosecution also presented the testimony of Michael Arnold.  While testifying consistently with his statement in many respects, Arnold testified that the gun which he claimed Mr. Miller had picked up did not work.

101.    Arnold testified that he told Bova and Coogan that the gun did not work, but they did not include it in the written statement they prepared during Arnold's interview.

102.    Given this testimony, as acknowledged by both the trial judge and trial prosecutor in later proceedings, and given the absence of any forensic evidence pointing to Mr. Miller's involvement, Williams' initial statement claiming that Mr. Miller confessed to the Mullen murder, as testified to by Piree, was the only direct evidence supporting the prosecution's case against Mr. Miller.

103.    In closing arguments, the trial prosecutor urged the jury to find Piree's testimony about Williams' statement credible.

104.    The trial prosecutor was able to argue that Piree testified credibly concerning Williams' statement because the defendant detectives had failed to disclose to prosecutors or Mr. Miller and his counsel any of the exculpatory information outlined above.

17

105.     After a day of deliberations, the jury found Mr. Miller guilty of all charges.

106.     On December 15, 1998, the trial court imposed on Mr. Miller a sentence of life imprisonment without parole.

**F.     David Williams' Admission of Guilt and Mr. Miller's Two-Decade Effort to Obtain Release**

107.     Mr. Miller took an appeal raising various grounds, but, ultimately, his conviction and sentence were affirmed.

108.     Then, in the fall of 2002, Mr. Miller received what appeared to be a major break. David Williams sent a letter to Mr. Miller's mother stating that he had been "living a lie for many years" and wanted to "clear [his] conscience."  Williams told Mr. Miller's mother in the letter that he had shot and killed Anthony Mullen.  He said, further, that Mr. Miller "had no knowledge of this crime" and "he wasn't even there."

109.     Armed with this significant evidence, Mr. Miller filed in the Philadelphia Court of Common Pleas a petition under the Post Conviction Relief Act.  A hearing was scheduled for Williams to provide testimony under oath about his commission of the crime.

110.     At the July 30, 2003, hearing, a prosecutor questioned Williams about the consequences of his testimony, asking whether Williams was "willing to submit [him]self to the punishment in this life of life imprisonment or the death penalty or hanging."

111.     In response to an objection, the trial judge stated that it was permissible for the prosecutor to ask whether Williams, "knowing that he's implicating himself, is willing to sacrifice his life on earth for his life in the aftermath."

112.     Rattled by this questioning, Williams gave incorrect information about the Mullen murder, misstating Mullen's race and incorrectly describing his clothing.

18

113.    In light of this testimony, the trial judge found that Williams' admission of guilt was not credible and denied Mr. Miller's petition.

114.    Thereafter, the Philadelphia District Attorney's Office brought perjury charges against Williams.  Presented with a favorable deal to resolve those charges, and based on the advice of his attorney who urged him not to defend against perjury charges with testimony that he did in fact commit a murder, he pled guilty.

115.    Approximately eight years later, in 2011, Williams wrote yet another letter to Mr. Miller's mother.  In this letter, he again admitted to murdering Anthony Mullen, and he apologized for his conduct at the July 30, 2003, hearing.

116.    In that same time period, Mr. Miller also obtained a statement from Michael Arnold recanting his original statement to police and his trial testimony, acknowledging that he had given false information.  Arnold explained that he only gave the defendant detectives a signed statement after they showed him Williams' original statement blaming him for providing a gun to Mr. Miller and informed him Williams would testify against him to prove he was involved in the murder.

117.    In possession of this new evidence, Mr. Miller, acting *pro se*, filed in the Philadelphia Court of Common Pleas another petition under the Post Conviction Relief Act.

118.    Thereafter, in August 2011, the Pennsylvania Innocence Project along with *pro bono* counsel agreed to conduct a full investigation of Mr. Miller's case.

119.    In the next six months, Mr. Miller's counsel made two critical discoveries:

a.  First, they interviewed Mark Manigault who told them that David Williams

had said that he was going to pin a crime on someone else to help himself.

Manigault also told them police interviewed him about the Mullen murder.

b.  Second, they interviewed Jack Williams who told them that David Williams

had given a false statement implicating him in the Paul Jones murder.

120.    Because the defendant detectives had never told anyone outside the PPD about the

exculpatory information they had in their possession concerning Manigault and Jack Williams,

neither Mr. Miller nor his counsel had ever been aware that these witnesses were relevant to Mr.

Miller's defense.

121.    Mr. Miller's counsel claimed in post-conviction litigation in state and federal

court that PPD detectives had been aware that information concerning Manigault and Jack

Williams was exculpatory and that they suppressed it in violation of Mr. Miller's due process

rights under, among other authorities, *Brady v. Maryland*.

122.    Litigation of these issues was pending in state court and then federal court for

nearly eight years.

123.    Throughout this time, the defendant detectives, as they had done since 1997,

failed to disclose to anyone the exculpatory information in their possession.

124.    On June 12, 2019, the Honorable Henry S. Perkin, U.S. Magistrate Judge, issued a

44-page Report and Recommendation recommending that the District Court grant Mr. Miller

habeas relief on the ground that Mr. Miller had established two separate *Brady* violations with

respect to Mark Manigault and Jack Williams.

20

125.    The Philadelphia District Attorney's Office elected not to challenge that Report and Recommendation.

126.    On July 1, 2019, the Honorable Anita B. Brody, U.S. District Judge, entered an Order approving and adopting the Report and Recommendation and vacating Mr. Miller's conviction and sentence.

**G.    Discovery of Exculpatory Information in the PPD H-File and the Dismissal of all Charges**

127.    Once Magistrate Judge Perkin issued a Report and Recommendation recommending a finding of *Brady* violations in Mr. Miller's case, the Conviction Integrity Unit of the Philadelphia District Attorney's Office ("CIU") initiated a comprehensive review of the Mullen murder investigation, including the PPD H-File.

128.    When the CIU reviewed the H-File, it found evidence confirming that the defendant detectives had, in fact, withheld highly exculpatory information.

129.    Among other things, the H-File contained the following:

a.    Piree's handwritten notes describing conversations with Sharkey about David Williams' claims that he and Manigault had information concerning the Mullen murder and David Williams's claims to have knowledge about Jack Williams' involvement in the Paul Jones murder;

b.    Piree's handwritten notes describing his intention to interview Manigault;

c.    An activity sheet showing that Piree interviewed Manigault and that Manigault did not know anything about the Mullen murder; and

    d.   An activity sheet showing that the defendant detectives confirmed Manigault's denials of knowledge were truthful based on police records showing he was in custody at the time of the Mullen murder.

130.    The CIU concluded that this information, which was present in the H-File but which had never been communicated to the District Attorney's Office, corroborated the claim that Mr. Miller had been making for 22 years—and the claim that David Williams had been making for just as long—that Mr. Miller had never confessed to murdering Anthony Mullen.

131.    Accordingly, the CIU determined that it did not believe David Williams' March 4, 1997 statement implicating Mr. Miller was true.

132.    In light of this determination, the CIU filed in the Philadelphia Court of Common Pleas a motion to dismiss all charges against Mr. Miller.

133.    On July 31, 2019, the Philadelphia Court of Common Pleas granted that motion, and Mr. Miller was released from prison.

134.    As such, the charges were terminated favorably to Mr. Miller.

**H.    The Defendant Detectives' Violations of Mr. Miller's Constitutional Rights**

135.    Mr. Miller is innocent of the charges that were brought against him.  He had nothing to do with the murder of Anthony Mullen.

136.    The defendant detectives, however, acted jointly and in concert and conspiracy to maliciously bring fabricated and false murder charges against Mr. Miller.

137.    At all times relevant to this Complaint, the conduct of defendant Detectives Piree, Coogan, Bova, Bell, and Sharkey was in willful, reckless, and callous disregard of Mr. Miller's clearly established rights under federal and state law.

22

138.    The defendant detectives violated Mr. Miller's right to due process of law by withholding the exculpatory information described above and by intentionally concealing and deliberately suppressing that information.

139.    The defendant detectives violated Mr. Miller's rights to due process of law by causing the introduction of David Williams' fabricated statement at Mr. Miller's preliminary hearing and trial, thereby causing his conviction for a crime he did not commit.

140.    The defendant detectives violated Mr. Miller's rights to be free from unreasonable searches and seizures by maliciously initiating a prosecution against him without probable cause.

141.    The defendant detectives violated Mr. Miller's right to equal protection of the law by intentionally and unlawfully prosecuting him with racial animus and bias against him as a Black man.

### I.    The PPD Homicide Division's Established History of Unconstitutional Practices and the City's Deliberate Indifference to those Practices

142.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long established history of practices in the PPD in general and specifically in the PPD Homicide Division.

143.    For many years dating back at least to the 1970s, and continuing well beyond the time of the investigation of the Anthony Mullen murder, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, concealing or withholding exculpatory evidence; using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; tampering with or manufacturing evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; and conducting improper

identification procedures.

144.    In particular, the City and its homicide detectives used these practices to target racial minorities, especially young Black men.

145.    These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

146.    Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at the time of the Mullen murder investigation, Mr. Miller's 1998 trial, and thereafter.   The cases include the following:

  a.   **Anthony Wright**:  Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence.   DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial.   His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

  b.   **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives extracted a statement from a witness to a robbery and murder by detaining the witness without food or water for days and by beating the witness. That statement led to the 1991 arrests of Hernandez and Williams, but it was later proven that Williams had been in a secured treatment facility at the time of the crime, thus undermining all of the evidence produced by

the detectives.

c. **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young witnesses into falsely claiming that Combs committed a murder in 1990.  Each witness later provided consistent accounts of the manner in which their false statements were secured: through the detectives' use of overwhelming physical and verbal abuse.

d. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force.  The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder.  Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office.

e. **Percy St. George:** A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder.  When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions.  Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

f. **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony.  In

securing the statement, detectives ignored the fact that Adams' physical description was vastly different from the description provided by witnesses at the scene.  Adams' conviction was later vacated, and he was acquitted at a retrial.  His subsequent civil suit resulted in a financial settlement.

g.  **Andrew Swainson:** PPD Homicide Division detectives based their arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes.  The witness identified Swainson in a photo array after he was threatened with arrest and shown a photo array that included seven different pictures of Swainson.  Based on this evidence, among other instances of misconduct, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

h.  **Walter Ogrod:** PPD Homicide Division detectives obtained an alleged confession from Ogrod in 1988.  Ogrod, who was intellectually compromised, had not slept for 36 hours before his interrogation.  In his first trial, 11 of 12 jurors voted to acquit him, and he was only convicted in a second trial when the prosecution introduced the testimony of a notorious jailhouse informant.  Based on evidence of substantial police misconduct and Ogrod's innocence, in June 2020, his conviction was vacated and all charges were dismissed.

i.  **James Dennis**: PPD Homicide Division detectives investigating a murder

in 1991 coerced witnesses to identify Dennis while at the same time they

intentionally concealed information which provided Dennis with a

incontrovertible alibi.  The detectives' conduct led to the Third Circuit's

issuance of an *en banc* decision concluding that the concealment of

evidence violated Dennis's due process rights.  *See Dennis v. Sec'y,*

*Pennsylvania Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

j.   **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in

1993 on charges that he was involved in a 1990 murder.  Thomas had a

documented alibi that he was present in juvenile court at the time the

murder occurred, but, based on testimony from another man who was

involved in the murder, Thomas was convicted.  In May 2019, the

Philadelphia District Attorney's Office agreed to dismiss the charges after

discovering, among other things, previously undisclosed information in

police files showing that several suspects had been stopped close in time

to the murder.  Thomas's civil rights suit resulted in a settlement for more

than $4 million.

147.   As evidenced by the pervasive nature of the conduct in these cases, detectives

in the PPD Homicide Division had free reign to engage in unconstitutional actions with the

knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors

and command staff, all of whom were deliberately indifferent to this misconduct.

148.   At the time of the investigation and prosecution of Mr. Miller in 1997 and

1998, the PPD had a policy, practice, or custom of concealing and withholding exculpatory

evidence, introducing fabricated evidence and initiating prosecutions without probable cause.

149.    These practices, as exemplified by the investigations in Mr. Miller's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia.

150.    During the 1980s and 1990s, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.

151.    On three separate occasions in the 1980s, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in such practices, with special emphasis on the racial animus employed in such practices. *See Cliett v. City of Philadelphia,* No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia,* 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia,* No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

152.    Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false

allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft.  This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

153.    These systemic and unconstitutional practices and customs were ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

154.    As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Miller was charged, and in light of evidence showing substantial racial bias in PPD practices, a Court in the Eastern District of Pennsylvania entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on PPD investigative practices and policies.  *See NAACP v. City of Philadelphia,* No. 96-cv-6045.

155.    In summary, at the time of the investigation and prosecution of Mr. Miller, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

a.    Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect

statements, and using improper identification procedures;

b.      Using these practices to target racial minorities, especially young
        Black men, for unlawful treatment;

c.      Failing to take appropriate disciplinary or other corrective actions
        with respect to police officers who engaged in illegal or
        unconstitutional conduct and/or violated generally accepted police
        practices;

d.      Failing to properly train and supervise officers with respect to the
        constitutional limitations on their investigative, detention, search and
        arrest powers;

e.      Failing to properly train and supervise officers with respect to the
        constitutional limitations on their investigative, detention, search
        and arrest powers;

f.      Ignoring, with deliberate indifference, systemic patterns of police
        misconduct and abuse of civilians' rights in the course of police
        investigations and prosecutions of criminal suspects and
        defendants, including unlawful police interrogations, searches, and
        arrests, coercion of witnesses, improper identification procedures,
        falsifying and fabricating evidence, and suppressing exculpatory
        evidence; and

g.      Failing to properly sanction or discipline PPD officers who were
        aware of and concealed and/or aided and abetted violations of

constitutional rights of individuals by other PPD officers, thereby

causing and encouraging Philadelphia police, including the

defendant officers in this case, to violate the rights of citizens such

as Mr. Miller.

156.    At the time of the investigation and prosecution of Mr. Miller, and for many

years before and thereafter, the City of Philadelphia was deliberately indifferent to the need

to train, supervise, and discipline police officers.  Specifically, the Internal Affairs Division

(IAD) of the PPD failed to provide an internal disciplinary mechanism that imposed

meaningful disciplinary and remedial actions in the following respects:

    a.    Excessive and chronic delays in resolving disciplinary complaints;

    b.    A lack of consistent, rational and meaningful disciplinary and remedial actions;

    c.    A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.    A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

    e.    Imposing incident-based, rather than progressive, discipline, resulting in the failure to penalize repeat violators;

    f.    Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

    g.    Institution of investigative procedures which adopted a default position that officers had not violated any rules;

h.      Failing to institute any quality control measures to ensure valid IAD findings and conclusions;

i.      Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary histories;

j.      Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

k.      Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

157.    Given all of the above, the City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Mr. Miller's constitutional rights.

**J.      Mr. Miller's Damages**

158.    The unlawful conduct of the defendants outlined above caused Mr. Miller to be improperly arrested, prosecuted, and imprisoned for more than 22 years for a crime he did not commit.

159.    As a direct and proximate result of defendants' actions and omissions, Mr. Miller sustained injuries and damages, including loss of his freedom for more than 22 years, loss of the most productive years of his adult life, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

160.    As a direct and proximate result of defendants' actions and omissions, Mr. Miller was deprived of his familial relationships, including time with his aging parents and participating in the lives of his niece and nephew.

161.    As a direct and proximate result of defendants' actions and omissions, Mr. Miller sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during the most productive years of his adult life.

162.    As a direct and proximate result of defendants' actions and omissions, Mr. Miller sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## V.    CAUSES OF ACTION

### COUNT 1
**Plaintiff v. Defendants Piree, Coogan, Bova, Bell, and Sharkey
Withholding, Suppression, and Concealment of Exculpatory Evidence**

163.    By failing to disclose exculpatory evidence to prosecutors and to Mr. Miller and by intentionally concealing and deliberately suppressing that evidence, defendants Piree, Coogan, Bova, Bell, and Sharkey violated Mr. Miller's right to due process of law under the Fourteenth Amendment to the U.S. Constitution.

### COUNT 2
**Plaintiff v. Defendants Piree, Coogan, Bova, Bell, and Sharkey
Fabrication of Evidence**

164.    Defendants Piree, Coogan, Bova, Bell, and Sharkey fabricated evidence in support of a prosecution against Mr. Miller and/or aided and abetted the introduction of fabricated evidence.  The fabrication of this evidence caused Mr. Miller's wrongful conviction

and, therefore, violated his right to a fair trial and due process of law under the Fourteenth Amendment to the U.S. Constitution.

### COUNT 3
**Plaintiff v. Defendants Piree, Coogan, Bova, Bell, and Sharkey**
**Malicious Prosecution**

165.    Defendants Piree, Coogan, Bova, Bell, and Sharkey caused the initiation of a prosecution against Mr. Miller without probable cause and with malice.  The criminal charges they caused to issue against Mr. Miller were terminated favorably to Mr. Miller.  These defendants, therefore, subjected Mr. Miller to a malicious prosecution in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution.

### COUNT 4
**Plaintiff v. Defendants Piree, Coogan, Bova, Bell, and Sharkey**
**Equal Protection**

166.    Defendants Piree, Coogan, Bova, Bell, and Sharkey intentionally engaged in unlawful practices resulting in the arrest, prosecution, conviction, and imprisonment of Mr. Miller based on their racial animus, and their discriminatory conduct denied Mr. Miller equal protection of the law in violation of the Fourteenth Amendment to the U.S. Constitution.

### COUNT 5
**Plaintiff v. Defendant City of Philadelphia**

167.    Defendant City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices and customs which were a moving force in the violation of Mr. Miller's constitutional rights, and, further, defendant City of Philadelphia, with deliberate indifference, failed to properly train, supervise and/or discipline officers and, as such, was a moving force in the violations of Mr. Miller's constitutional rights.

34

**COUNT 6**
**Plaintiff v. Defendants Piree, Coogan, Bova, Bell, and Sharkey**
**Supplemental Claim – Malicious Prosecution**

168.　Defendants Piree, Coogan, Bova, Bell, and Sharkey, as described above, caused the malicious prosecution of Mr. Miller, and, as such, committed the tort of malicious prosecution under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff John L. Miller, III, respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Piree, Coogan, Bova, Bell, and Sharkey;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
ID No. 88227
jfeinberg@krlawphila.com

/s/ David Rudovsky
David Rudovsky
ID No. 15168
drudovsky@krlawphila.com

/s/ Paul Messing
Paul Messing
ID No. 17749
pmessing@krlawphila.com

/s/ Susan M. Lin
Susan M. Lin
ID No. 94184
slin@krlawphila.com

KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)
*Counsel for Plaintiff*

36